# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**BRENDA JACKSON and**
**SHERRI LISIECKI,**

      **Plaintiffs,**                    **Case No. 02-C-936**

**v.**

**RACINE COUNTY,**

      **Defendant.**

---

**THE ESTATE OF LINDA R. SCHULTZ,**

      **Plaintiff,**                     **Case No. 02-C-1262**

**v.**

**RACINE COUNTY,**

      **Defendant.**

---

 **PATRICIA BIRCHELL-SIELAFF,**

      **Plaintiff,**                     **Case No. 02-C-1263**

**v.**

**RACINE COUNTY,**

      **Defendant.**

---

### DECISION AND ORDER ON RACINE COUNTY'S AND THE PLAINTIFFS' CROSS-MOTIONS FOR SUMMARY JUDGMENT

---

On September 19, 2002, co-plaintiffs Brenda Jackson ("Jackson") and Sherri Lisiecki ("Lisiecki") filed case number 02-C-936 against Racine County. Their complaint alleges sexual harassment by Robert Larsen ("Larsen"), the Racine County child support division supervisor, and retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. On December 27, 2002, Patricia Birchell-Sielaff ("Birchell-Sielaff") and Linda Nutt, who is now proceeding as the Estate of Linda R. Schultz ("Schultz"), filed case numbers 02-C-1263 and 02-C-1262 respectively. Both of those cases also allege Title VII claims against Racine County based on retaliation and Larsen's alleged sexual harassment.

Based on the same defendant and allegations common to all three cases, the parties agreed to consolidate the cases for purposes of discovery. (Order April 2, 2003.). Discovery is now closed, and the parties have filed cross-motions for summary judgment. Although the three cases are not consolidated for purposes summary judgment, the issues presented in the parties' cross-motions for summary judgment are related. Accordingly, the court will address all of the parties' motions in this decision, and will discuss facts and issues relevant to a particular plaintiff where necessary.

The pleadings on the parties' motions for summary judgment are now closed and they are ready for resolution. Jurisdiction is proper based on federal questions. 28 U.S.C. § 1331. Venue is proper in the Eastern District of Wisconsin. 28 U.S.C. § 1391(b). In addition, the parties have consented to exercise of this court's full jurisdiction, including the entry of final judgment. 28 U.S.C. § 636(c); FED. R. CIV. P. 72(c).

## Racine County's Motion for Summary Judgment

Racine County seeks summary judgment as to all of the plaintiffs, claiming: (1) that the plaintiffs' allegations do not establish hostile work environment sexual harassment, as that term is

defined by Title VII and (2) that the requirements of the affirmative defense set forth in <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775 (1998) and <u>Burlington Industries Inc. v. Ellerth</u>, 524 U.S. 742 (1998) are satisfied.  In support of its second claim, Racine County submits that none of the plaintiffs suffered an adverse employment action, that it exercised reasonable care to prevent the complained of behavior, and that the plaintiffs failed to take advantage of available preventative opportunities. (Racine County Br. at 4.).  Racine County also claims that summary judgment as to all plaintiffs is appropriate because none of the plaintiffs have established a prima facie case of retaliation or that Racine County's reasons for its actions were pretextual.  (Racine County Br. at 22.).  In addition, Racine County seeks summary judgment as to Schultz, claiming that Schultz died on March 27, 2003 and has presented no evidence based on personal knowledge.  (Racine County Br. at 3-4; Racine County PFOF ¶¶ 43-44.).

<b><u>The Plaintiffs' Motions for Partial Summary Judgment</u></b>

The plaintiffs oppose Racine County's motions for summary judgment.  In addition, each plaintiff has filed her own motion for partial summary judgment as to their respective hostile work environment claims.  In support of their motions for partial summary judgment, and in opposition to Racine County's motions, the plaintiffs claim that the elements of a prima facie case for a hostile work environment are satisfied, as a matter of law, in this case.  In conjunction with the fourth element of a prima facie case—which requires the plaintiffs to demonstrate that there is a basis for imputing liability for Larsen's actions to Racine County—the plaintiffs claim that the <u>Faragher/Ellerth</u> defense to employer liability does not apply under these facts.

3

In opposition to Racine County's motion for summary judgment on their retaliation claims, the plaintiffs essentially argue that they lost substantial job responsibilities and were not communicated with as a result of their claims against Larsen.

<u>**Analysis**</u>

A motion for summary judgment will be granted when there are no genuine issues as to material fact and the movant is entitled to judgement as a matter of law. FED. R. CIV. P. 56(c). As provided under Rule 56(c), only "genuine" issues of "material" fact will defeat an otherwise "proper" motion for summary judgment. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). "[M]aterial facts are those facts which, under the governing substantive law, "might affect the outcome of the suit." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A dispute of such material facts is "genuine" if the evidence is such that a reasonable trier of fact could find in favor of the non moving party. <u>Id</u>.

The movant bears the burden to establish that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 159 (1970); <u>see</u> <u>also</u> <u>Celotex Corp.</u>, 477 U.S. at 323 (the moving party has the responsibility of informing the court of portions of the record or affidavits that demonstrate the absence of a triable issue). In addition, the moving party may meet its burden to show an absence of a material issue by demonstrating "that there is an absence of evidence to support the nonmoving party's case." <u>Celotex Corp.</u>, 477 U.S. at 325. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. <u>Anderson</u>, 477 U.S. at 255; <u>Cain v. Lane</u>, 857 F.2d 1139, 1142 (7th Cir. 1988); <u>Spring v. Sheboygan Area School Dist.</u>, 865 F.2d 883, 886 (7th Cir. 1989). If the moving party meets its burden, the nonmoving party then has the burden to present specific facts showing that there is a

4

genuine issue of material fact. <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986).

The summary judgment standard is "applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." <u>Sarsha v. Sears, Roebuck & Co.</u>, 3 F.3d 1035, 1038 (7th Cir. 1993). Further, "on summary judgment, a court can neither make a credibility determination nor choose between competing interests." <u>Id</u>. at 1041.

Each party has submitted numerous proposed findings of fact in support of their respective motions. For example, plaintiff Brenda Jackson's submission contains 250 separate statements of fact. The defendant has submitted a total of 176 proposed findings of fact, and many have sub-parts. The court has reviewed and compared these submissions and has concluded that for purposes of this decision, it is not necessary to engage in an extensive discussion of undisputed and disputed facts. This is because the basic position of Racine County is that the facts alleged by the plaintiff are not actionable under Title VII. The court will therefore only refer to certain facts, as deemed appropriate, to support its decision.

## I. HOSTILE WORK ENVIRONMENT CLAIMS

To establish prima facie case of hostile work environment sexual harassment, the employee must show that: (1) he or she was subjected to unwelcome sexual harassment in form of sexual advances, requests for sexual favors, or other verbal or physical conduct of sexual nature; (2) the harassment was based on sex; (3) the harassment had effect of unreasonably interfering with employee's work performance in creating intimidating, hostile, or offensive working environment that affected seriously the psychological well-being of employee; and (4) there is basis for employer liability. <u>Moser v. Indiana Dept. of Corrections</u>, 406 F.3d 895, 902 (7th Cir. 2005); <u>Hall v. Bodine</u>

5

Elec. Co., 276 F.3d 345, 354-55 (7th Cir. 2002); Parkins v. Civil Constructors of Illinois, Inc., 163 F.3d 1027, 1032 (7th Cir. 1998).

While the parties raise many issues in support of and in opposition to their motions for summary judgment, the first issue that the court will address is whether the plaintiffs are able to satisfy the third element of a hostile work environment claim. If Larsen's conduct is not actionable by failure to satisfy the prima facie requirements, summary judgment in favor of Racine County is mandated, and the court need not reach other issues raised by the parties, including whether the plaintiffs made reasonable efforts to report Larsen's conduct and whether Racine County's response to the plaintiffs' claims was adequate.

The Seventh Circuit Court of Appeals has discussed what constitutes an actionable hostile work environment claim in numerous cases. An employee must demonstrate that her co-worker or supervisor harassed her because of her sex to maintain an actionable claim. Hilt-Dyson v. City of Chicago, 282 F.3d 456, 462 (7th Cir. 2002). As it has been made very clear in this circuit and others, not all offensive workplace behavior violates the law. Smith v. Sheahan, 189 F.3d 529, 532 (7th Cir. 1999). "The harassment must be 'so **severe or pervasive** as to alter the conditions of [the victim's] employment and create an abusive working environment.'" Hilt-Dyson, 282 F.3d at 462 (emphasis added). A "hostile work environment is one that is 'both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive and one that the victim in fact did perceive to be so.'" Id. at 463. A number of factors may be considered when determining whether there is an objectively determinable hostile work environment. Some of those factors include: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct was physically threatening or humiliating or was it merely an offensive utterance; and (4) whether the harassment

6

interferes with the employees work performance.  Adusumilli v. City of Chicago, 164 F.3d 353, 361 (7th Cir. 1998); Hostetler v. Quality Dining, Inc., 218 F.3d 798, 806-07 (7th Cir. 2000).  The objective severity of the harassment should be made from a reasonable person point of view, considering all the circumstances and the social context, lest Title VII become a "general civility code for the American workplace."  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998).

While less egregious acts of harassment must be frequent or pervasive before they  will create a hostile work environment, one event, if severe enough, can create a hostile work environment.  See King v. Board of Regents of Univ. of Wis. Sys., 898 F.2d 533, 537 (7th Cir.1990); Bohen v. City of East Chicago, Indiana, 799 F.2d 1180, 1186-87 (7th Cir.1986).  However, no magic number of events are required.  Doe v. R.R. Donnelley & Sons Co., 42 F.3d 439, 445 (7th Cir.1994).  "'[T]he occasional vulgar banter, tinged with sexual innuendo of course or boorish workers, generally does not create a work environment that a reasonable person would find intolerable."  Hilt-Dyson, 282 F.3d at 463.

All of the plaintiffs claim that Larsen's conduct created a hostile work environment.  Racine County submits that it did not.  Specifically, Racine County claims that Larsen's actions were not objectively severe enough nor pervasive enough to create a hostile work environment, even if all of the plaintiffs' allegations are considered true.  The court agrees.  While it is often difficult to discern the line that separates conduct that is merely vulgar and mildly offensive from conduct that is deeply offensive and sexually harassing, a review of the case law in this circuit demonstrates that the conduct alleged by the plaintiffs, even if deemed offensive, is not actionable under Title VII.  The court will first cite cases in this circuit in which the conduct was found actionable and then analyze plaintiffs' allegations to see whether they cross the actionable threshold.

7

In Smith v. Sheahan, the Seventh Circuit found a hostile work environment when a male co-worker called the female plaintiff "a 'bitch,' threatened to 'fuck her up,' pinned her against a wall, and twisted her wrist severely enough to damage her ligaments, draw blood and eventually require surgical correction." 189 F.3d 529, 531 (7th Cir. 1999). In Hostetler v. Quality Dining Inc, the Seventh Circuit reversed the decision granting summary judgment for the employer when a co-worker (1) forcibly kissed the plaintiff, (2) attempted to unfasten the plaintiff's brassiere on a separate occasion, when the plaintiff turned away and buried her face in her lap to avoid another unwelcome kiss, and (3) approached the plaintiff while she was attending to customers and told her that he could perform oral sex on her so effectively that "'[she] would do cartwheels." 218 F.3d at 798 (alterations in original). And finally, in Carr v. Allison Turbine Division, General Motors Corp., the Seventh Circuit affirmed the district court's conclusion that co-workers' conduct was actionable, where the plaintiff alleged that her co-workers:

1. made derogatory comments of a sexual character to her on a daily basis, such as, "I won't work with any cunt";
2. continually referred to Carr by such terms as "whore," "cunt," and "split tail;"
3. painted "cunt" on her toolbox;
4. played various sex- or gender-related pranks on Carr, such as painting her toolbox pink and, without Carr's knowledge, cutting out the seat of her overalls;
5. covered her tool box and work area with signs, pictures, and graffiti of an offensive sexual character;
6. hid and stole Carr's tools and equipment;
7. hung nude pin-ups around the shop;
8. stripped to their underwear in front of Carr when changing into and out of their work clothes;
9. placed an obscene Valentine Day's card, addressed to "Cunt," on Carr's toolbox;
10. exposed themselves to Carr on two occasions;
11. told Carr that if one of the male co-workers fell from a dangerous height in the shop she would have to give him "mouth to dick" resuscitation;
12. urinated from the roof of the shop in Carr's presence;
13. in Carr's presence, accused a black employee of being "after that white pussy, that is why you want a woman here, you want some of that;"

8

14.     frequently made comments such as "I'll never retire from this tinsmith position because it would make an opening for a nigger or a woman;" and

15.     threw a burning cigarette at Carr.

32 F.3d at 1009-1010.

### **The Plaintiffs' Allegations**

The egregious conduct described in all three of these cases differs dramatically from the conduct alleged by the plaintiffs. Of all the plaintiffs, Jackson's allegations are the closest to being "severe or pervasive." In terms of physical contact, Jackson claims that Larsen touched her on a daily basis and, on one occasion, placed his arm around her and kissed her on the lips. (Jackson and Lisiecki Resp. Br. at 12; Jackson and Lisiecki Proposed Findings of Fact (hereinafter "PFOF") ¶ 75.). In addition, Jackson says that, on two occasions, Larsen wet his finger, stuck it in her ear and blew into her ear. (Jackson and Lisiecki PFOF ¶ 80.).

Jackson also cites comments that Larsen allegedly made to her or within her hearing. Specifically, Jackson claims that Larsen sent her emails containing sexual innuendos, made jokes about women, asked "[c]an I give you a kiss?" while offering her chocolate Hershey kisses, told her that he and his wife "had sex all weekend, and discussed rumors that he fathered a co-worker's child and was having an affair. (Id. ¶¶ 67, 69, 84, 86, 95.). On one occasion, Larsen allegedly made gutteral noises, stared at Jackson and asked Jackson whether she had pulled her sweater up or whether the sweater had moved its way up when she bent over. (Id. ¶ 78.). On another occasion Larsen allegedly said "[c]an you do this? Because that is the only important one" while moving his hand near his penis to simulate masturbation. (Id. ¶ 85.). Furthermore, Jackson claims that Larsen once said she had a "great set of boobs" and at one time involved her in a plan to bring a female employee into the child support division. (Id. ¶¶ 79, 94.). According to Jackson, Larsen wanted to work with the employee

9

because he missed her and commented that "he couldn't wait to have [the employee] working underneath him again, oh underneath me." (Id. ¶ 94.). Jackson also says that she saw Larsen "rubbing on" Lisiecki, observed Larsen stick his wet finger in Lisiecki's ear and blow in it, heard Larsen comment on the way Lisiecki and Schultz looked wearing skirts, and heard Larsen comment on the size of a female co-worker's butt. (Id. ¶¶ 88-91.).

As to professional actions, Jackson claims that Larsen frequently changed the staff she supervised, said that he might transfer Jackson's position to another department, did not include Jackson in management meetings, disciplined Jackson for moving a report and told Jackson "you've been a good girl, you've earned it." (Id. ¶¶ 71-77, 100-104.). Jackson believes that these actions were triggered by her refusal to accept Larsen's offensive behavior and the fact that Jackson told Larsen he was "sick." In addition, Jackson claims that Larsen slammed his door and yelled at the female employees but did not do those things to the male employees. (Id. ¶¶ 106-107.).

The allegations submitted by Lisiecki, Birchell-Sielaff, and Schultz are similar to the allegations submitted by Jackson. Lisiecki claims that Larsen made comments to her regarding her clothing, looked her up and down, looked at other female employees in a "sexually related" manner, sent sexually explicit emails, said he would love to be under Lisiecki's desk on one occasion, suggested that Lisiecki come to work in her swim suit in response to Lisiecki's complaint that the office was hot, and told a female co-worker employee to tell her husband that she "went up and down with Bob." (Id. ¶¶ 126, 130-131, 142, 148.). Lisiecki also says that, on one occasion, Larsen blew into her ear and touched the back of her neck and that Larsen regularly touched her hair or shoulders when he brought Lisiecki an assignment or gave her instructions. (Id. ¶¶ 143-144; Jackson and Lisiecki Resp. Br. at 10.). Lisiecki also claims that Larsen told her she might be promoted, that he did

10

this because he wanted to "take liberties with her," and that he no longer discussed her promotion after Lisiecki refused to accept his behavior. (Id. ¶¶ 132-140; Jackson and Lisiecki Resp. Br. at 10.).

Birchell-Sielaff says that Larsen gave out chocolate Hersey's kisses during meetings that she conducted, favored certain female employees and then changed his attitude to favor other employees, acted erratically, slammed doors, commented on how female employees looked in particular clothing, commented on a female employee's breast on one occasion, made sexual jokes, discussed his sex life, talked about female employees that he found unattractive, and disciplined Birchell-Sielaff after she expressed concerns regarding the workload of the enforcement staff. (Birchell-Sielaff and Schultz Joint PFOF ¶¶ 12, 19-20, 25-31, 37, 80-82; Birchell-Sielaff Resp. Br. at 25-26.).

Similarly, Schultz submits she too was subjected to Larsen's presentation of Hersey's kisses, jokes and emails, erratic and angry behavior, comments about her appearance in particular clothing, leering, and comments regarding the appearance of other female employees. In addition, Schultz says that Larsen hugged her, assigned her long work hours and tasks outside of her job description, and if Larsen saw Schultz eating her morning breakfast of a banana, he commented that he liked watching her eat the banana. (Schultz Resp. Br. 21-23; Pls.' Joint Resp. to Def.'s PFOF ¶ 44; Birchell-Sielaff and Schultz Joint PFOF ¶ 33-39.).

## Analysis

Some of the conduct cited by the plaintiffs certainly falls far short of what the Seventh Circuit deems actionable. For example, although the plaintiffs might have been subjectively offended when Larsen offered them a Hersey's chocolate kiss and said "can I give you a kiss," such a statement is not *objectively* threatening, harsh, or abusive. It could not even be categorized as vulgar. As stated in Baskerville v. Culligan Int'l Co., comments that have the "sexual charge of an Abbott and Costello

11

movie" and that "could [easily] be repeated on primetime television" are not the type that trigger Title VII liability. 50 F.3d 428, 431 (7th Cir. 1995). Similarly, while Larsen's alleged comment that Jackson was a "good girl" who earned her discipline might be categorized as mean or unkind, it is not sexual and is not comparable to the demeaning slurs used in Carr and Smith. Far worse than those comments—or any of the specific comments allegedly made to the plaintiffs—have been deemed not actionable by the Seventh Circuit. See e.g. Patt v. Family Health Sys., Inc., 280 F.3d 749, 754 (7th Cir.2002)(holding that plaintiff's complaints of eight gender-related comments during course of her employment, including that "the only valuable thing to a woman is that she has breasts and a vagina," insufficient to demonstrate hostile work environment).

Moreover, while the Seventh Circuit allows the court to consider conduct that is directed at other employees when evaluating the totality of the plaintiff's work environment, such conduct is less offensive than conduct that is directed at the plaintiff. Cowan v. Prudential Ins. Co., 141 F.3d 751, 758 (7th Cir. 1998)(citing Gleason v. Mesirow Financial, Inc., 118 F.3d 1134, 1144(7th Cir. 1997("the impact of 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff")). Accordingly, comments that Larsen allegedly made to the plaintiffs about the appearance other female employees bear less weight than the comments directed towards the plaintiffs themselves. Similarly, the plaintiffs' observations of physical contact with other employees are less significant than the physical contact that Larsen allegedly had with the plaintiffs directly.

In that regard, it is indeed troubling that Larsen allegedly kissed Jackson on one occasion; stuck his finger in Jackson's ear on two occasions; regularly "touched" Jackson; touched Lisiecki's hair, neck, and shoulders when giving her instructions; on one occasion, blew into Lisiecki's ear and touched the back of her neck; and hugged Schultz. These physical contacts (to which the court

Case 2:02-cv-00936-AEG   Filed 09/19/05   Page 12 of 24   Document 141

assumes that the plaintiffs did not consent) have a greater propensity to be threatening and intimidating than any of the comments that the plaintiffs cite. However, not every physical contact necessitates the conclusion that a work environment was severe or pervasive. The Hostetler court differentiated the type of physical contact that is actionable from the type that is not actionable as follows:

> Physical harassment lies along a continuum just as verbal harassment does. There are some forms of physical contact which, although unwelcome and uncomfortable for the person touched, are relatively minor. Cumulatively or in conjunction with other harassment, such acts might become sufficiently pervasive to support a hostile environment claim, but if few and far between they typically will not be severe enough to be actionable in and of themselves. A hand on the shoulder, a brief hug, or a peck on the cheek lie at this end of the spectrum. Even more intimate or more crude physical acts–a hand on the thigh, a kiss on the lips, a pinch of the buttocks–may be considered insufficiently abusive to be described as 'severe' when they occur in isolation.
>
> * * *
>
> When the harassment moves beyond the sort of casual contact which (if it were consensual) might be expected between friendly co-workers, and manifests in more intimate, intrusive forms of contact, it becomes increasingly difficult to write the conduct off as a pedestrian annoyance.

Hostetler, 218 F.3d at 808 (internal citations omitted).

With these standards in mind, this court concludes that the physical contacts between Larsen and the plaintiffs are not the type that would allow a hostile work environment claim, even when viewed in conjunction with the plaintiffs' other allegations. Jackson's general allegation that Larsen regularly "touched" her, without specification as to where she was touched or any indication that the touching went beyond "[a] hand on the shoulder, a brief hug, or a peck on the cheek" means that the conduct lies at the end of the spectrum that is not severe. The same is true in regard to the hugging cited by Schultz and the contacts cited by Lisiecki. The other physical contacts cited by Jackson—Larsen sticking his finger in Jackson's ear and kissing her without consent—are more

13

intrusive. However, they rarely occurred and, under the quoted passage from <u>Hostetler</u>, would still fall in the realm of conduct that is not actionable. <u>See</u> <u>id</u>.

Ultimately, it is important that the concept of sexual harassment is designed to protect working women from the kind of attention that can make the work place "hellish." <u>Baskerville</u>, 50 F.3d at 430. It is not designed to purge the workplace of vulgarity. <u>Id</u>. If the court assumes that all of the plaintiffs' allegations are true, Larsen certainly acted in a most immature and inappropriate fashion. However, all of the incidents, spread over the approximately eight months that Larsen worked in the child support division, could not reasonably lead to the conclusion that Larsen subjected the plaintiffs to an environment that could be described as hellish.

On the contrary, the plaintiffs' allegations are analogous to those that the Seventh Circuit has consistently deemed not actionable. For example, in <u>McPherson v. City of Waukegan</u>, the court found that a superior's actions did not create a hostile work environment (prior to the time that the plaintiff was assaulted) even though the superior asked the plaintiff and other female employees what color bra they were wearing on several occasions, asked McPherson in a suggestive tone of voice if he could "make a house call" when she was sick, pointed out lingerie in a catalog and told McPherson that she would look good wearing it, and pulled back McPherson's top to look at her bra. 379 F.3d 430, 434-435, 439 (7th Cir. 2004). Similarly, in <u>Weiss v. Coca-Cola Bottling Company of Chicago</u>, the court found the plaintiff's allegations not actionable where Weiss' supervisor allegedly asked about her personal life, complimented her, told her that she was beautiful, asked her on dates, called her a dumb blond, attempted to kiss her outside of work, put an "I love you" sign on her desk, put his hand on her shoulder several times, avoided her for a period of time after his affections were rejected, and twice attempted to kiss her while at work. 990 F.2d 333, 334-35 (7th Cir. 1993). And finally, in <u>Cowan v.</u>

Prudential Insurance Company of America, the court held that allegations were not actionable where plaintiff claimed that a provocatively dressed woman was depicted in client distributions, a cartoon depicting two safes involved in "safe sex" was circulated, the plaintiff's manager said he could do like the plaintiff and abstain from sex, the plaintiff's supervisor ignored her and refused to speak with her, the plaintiff was not included in social activities that were attended by male co-workers only, male co-workers called each other names that were derogatory to women, an immediate supervisor loudly referred to women as "blood-suckers," "leeches" and "dizzy broads," the male employees frequently discussed their exploits at a local strip club, a photograph of a male employee with a stripper was circulated in the office, sexual joking was rampant, and plaintiff's supervisor asked her why she did not "just get married and let some man take care of her." 141 F.3d 751, 756 (7th Cir. 1998).

Accordingly, in light of the threshold for actionable conduct developed by Seventh Circuit case law, the court will grant Racine County's motion for summary judgment on the plaintiffs' hostile work environment claims. As no hostile work environment was created, the court need not discuss Racine County's affirmative defense based on Faragher and Ellerth, and the court will turn its attention to Racine County's motion for summary judgment on the plaintiffs' retaliation claims.

## II. RETALIATION CLAIMS

### Position of the Plaintiffs

In addition to their hostile work environment claims, the plaintiffs also assert retaliation claims against Racine County. In her complaint, Schultz alleges that she lost certain supervisory responsibilities after she refused Larsen's sexual advances and reported Larsen's conduct to Racine County. (Schultz Cmplt. ¶¶ 47-49.). Specifically, Schultz claims that William Adams ("Adams"), Racine County's director of human resources, refused to communicate with her regarding work related

matters; that John Lehman ("Lehman"), who replaced Larsen as the child support division manager, effectively eliminated Schultz's authority by telling Schultz's staff that her "job is useless;" by commenting that she is "too stupid for the job;" and by not involving with Schultz on work that she should be supervising. In addition, Schultz claims that Lehman changed the assignments of her staff and removed staff from her control. (Schultz Cmplt. ¶¶ 63-67.).

Birchell-Sielaff's retaliation claim alleges that Adams and Lehman did not communicate with her and that she was not offered the position of temporary division manager after Larsen was transferred to a different job, despite that she filled that position in the past. (Birchell-Sielaff Resp. Br. at 41.). Moreover, Birchell-Sielaff states that Lehman removed her responsibility to make day-to-day decisions about the department, that Larsen did not meet with her face-to-face, and that she no longer has hiring authority, and that she was not permitted to attend a conference. (Birchell-Sielaff Resp. Br. 41- 42.).

Jackson's retaliation claim alleges that Adams and Mark Janiuk ("Janiuk"), who acted as the temporary child support division manager after Larsen's transfer, failed to communicate with her. (Jackson and Lisiecki Cmplt. ¶¶ 30-31.). As a result of their alleged lack of communication, Jackson states that she was not able to effectively perform her job. (Id.). Jackson also claims that, once Lehman replaced Larsen as division manager, she was no longer consulted about her staff's assignments, was not advised about what directives and projects the division was carrying out, and, generally, not communicated with. According to Jackson, Lehman required the supervisors to submit emails to him for approval, did not respond to her attempts to discuss work related-issues, and ignore a number of her emails. (Jackson and Lisiecki Cmplt. ¶¶ 31-41; Jackson and Lisiecki Resp. Br. 27-28.). Furthermore, Jackson claims that Lehman usurped her for performance reviews and job

16

assignments, did not allow her to attend a conference, and eliminated some of her job duties—namely, assigning work, budgeting, and hiring staff.  (Jackson and Lisiecki Resp. Br. 27-28.).

From Jackson and Lisiecki's joint complaint, it is unclear whether Lisiecki intended to assert a retaliation claim.  The section of the joint complaint that is labeled "Retaliation" states that Lisiecki filed a grievance about Larsen's conduct with her union, that Racine County did not respond because Larsen was not a member of the bargaining unit, and that Racine County responded to other grievances about non-union supervisors' conduct in the past.  (Lisiecki Cmplt. ¶ 43-45.).  However, the complaint does not specify any adverse employment action that occurred after Lisiecki filed a complaint about Larsen's conduct.  In addition, Lisiecki is not mentioned in Jackson's and Lisiecki's joint response to Racine County's motion for summary judgment on their retaliation claims.  (Jackson and Lisiecki Resp. Br. 27-28.).  Accordingly, the court will grant the defendant's motion for summary judgment on Lisiecki's retaliation claim, to the extent that a retaliation claim was intended, and Lisiecki will not be discussed further in this portion of the decision.

### Summary Judgment Standard of Review for Retaliation

Racine County filed a motion for summary judgment as to the plaintiffs' retaliation claims. To defeat Racine County's motion, the plaintiffs may proceed under the direct or the indirect method of proof.  Haywood v. Lucent Techs., Inc., 323 F.3d 524, 531 (7th Cir.2003); Rogers v. City of Chicago, 320 F.3d 748, 753 (7th Cir. 2003).  Under the direct method of proof, the plaintiff must establish (1) a statutorily protected activity; (2) an adverse employment action taken by the employer; and (3) a causal connection between the two.  Davis v. Con-Way Transp. Central Express, Inc., 368 F.3d 776, 786 (7th Cir.2004).  To satisfy the third element of the direct method, a plaintiff must point to an outright admission by the decision maker that the challenged action was undertaken because of

17

the plaintiff's protected activity, or circumstantial evidence that forms a "convincing mosaic" that shows the discriminatory intent by the decision maker. <u>Rhodes v. Illinois Dept. of Transp.</u>, 359 F.3d 498, 504 (7th Cir.2004).

Alternatively, the plaintiff my proceed under the indirect method. In <u>Stone v. City of Indianapolis</u>, 281 F.3d 640 (7th Cir.2002), the Seventh Circuit enunciated a new rule for proving retaliation under the indirect method. <u>Rogers</u>, 320 F.3d at 755. Under <u>Stone</u>, a plaintiff must show that after filing the [complaint of discrimination] only she, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action even though she was performing his job in a satisfactory manner. <u>Id</u>. Breaking this test into its elements, the plaintiffs must show the following: (1) that she engaged in a statutorily protected activity; (2) that she met the employer's legitimate expectations; (3) that she suffered an adverse employment action; and (4) that she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. <u>Moser v. Indiana Dept. of Corrections</u>, 406 F.3d 895, 903-04 (7th Cir. 2005). If the defendant presents no evidence in response, the plaintiff is entitled to summary judgment. <u>Rogers</u>, 320 F.3d at 755. If the defendant presents unrebutted evidence of a noninvidious reason for the adverse action, he is entitled to summary judgment. Otherwise there must be a trial. <u>Id</u>. This clarified rule is a variation of the familiar burden-shifting method found in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), and eliminates the requirement, noted in some of this circuit's earlier decisions, that the plaintiff prove a "causal link" between his protected action and an adverse employment action. <u>Id</u>. (citing <u>Stone</u>, 281 F.3d at 642-44).

Notably, regardless of whether the plaintiff uses the direct method or the indirect method, the plaintiff must always point to a materially adverse employment action. <u>Hottenroth v. Village of</u>

<u>Slinger</u>, 388 F.3d 1015, 1029 (7th Cir. 2004). Racine County's motion for summary judgment claims, among else, that none of the plaintiffs satisfy this requirement.

<u>**Analysis**</u>

Although creating a precise list of activities that constitute adverse employment actions would be impossible, an adverse employment action might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation. <u>Moser</u>, 406 F.3d at 904 (<u>citing</u> <u>Crady v. Liberty Nat'l Bank & Trust Co. of Indiana</u>, 993 F.2d 132, 136 (7th Cir.1993)). An adverse employment action need not be quantifiable in terms of pay or benefits. <u>See</u> <u>Smart v. Ball State Univ.</u>, 89 F.3d 437, 441 (7th Cir.1996). At the same time, however, not every change that makes an employee unhappy is actionable for purposes of a Title VII retaliation claim. <u>Hilt-Dyson v. City Of Chicago</u>, 282 F.3d 456, 466 (7th Cir. 2002). Moreover, an "adverse employment action" must be materially adverse and not merely an inconvenience or a change in job responsibilities. <u>Griffin v. Potter</u>, 356 F.3d 824, 829 (7th Cir. 2004).

**1. Jackson's Retaliation Claim**

In the present case, the plaintiffs have not met their burden of proof in establishing that they were subjected to materially adverse employment actions. Jackson's claim will be discussed first. In regard to Jackson, it is clear that many changes were made when Janiuk and Lehman replaced Larsen as manager of the child support division. However, it cannot be expected that Lehman, as a new permanent manager, would run the child support division the exact same way that Larsen did. While Jackson might have been required to do things differently under Lehman's lead, it is undisputed that Jackson was not terminated, was not transferred from the child support division, did not receive

19

a decrease in her salary, was not assigned a less distinguished title, and maintained the same benefits. In addition, it is irrelevant that Lehman did not communicate with Jackson or that he was unfriendly to Jackson, if Jackson fails to also establish that Lehman's actions prevented her from doing her job. In that regard, it is important that Lehman handled certain tasks himself and dealt with employees personally. As to those things, there might not have been a need for Lehman to consult with Jackson. However, this does not mean that Jackson's job necessarily became worse. For example, Jackson does not allege that, in place of her previous duties, Lehman assigned her duties that were demeaning or well below her capabilities. In fact, Jackson fails to discuss what amount of time she dedicated to the duties that were no longer performed once Lehman took over for Larsen, does state what tasks she continued to do, and does not compare the amount of time she spent on her different duties. This prevents the court from concluding that Jackson's material responsibilities were "significantly diminished" rather than simply altered.

Furthermore, the fact that Lehman did not consult with Jackson does not mean that Jackson was deprived of her authority to supervise the staff. If Jackson did not know what tasks Lehman assigned to the staff because Lehman did not discuss projects with her, Jackson could have taken the same approach that Lehman did and consulted with the staff directly. While it might have been more time consuming to speak with employees individually, rather than discuss objectives in a single meeting with Lehman, inconvenience does not constitute sufficient basis for a retaliation claim. For the same reason, Jackson cannot proceed based on the fact that Lehman required her to submit emails for his approval before she sent them to her staff. Furthermore, Jackson's claim that she was not permitted to attend a conference cannot be considered an adverse employment action because Jackson does explain what the topics would have been discussed at the conference, does not specify the

20

duration of the conference, and, ultimately, has made no showing that the conference was vital to her job. Accordingly, and for all of these reasons, the court will grant Racine County's motion as to Jackson's retaliation claim.

### 2. Birchell-Sielaff's Retaliation Claim

Much of the reasoning discussed in regard to Jackson applies with equal force to the claims made by Birchell-Sielaff. Like Jackson, Birchell-Sielaff does not claim that she was terminated, was transferred from the child support division, received a decrease in her salary, was assigned a less distinguished title, or lost benefits. In addition, while Birchell-Sielaff alleges that her responsibilities to make day-to-day decisions and to hire employees were eliminated when Larsen was transferred out of the child support division, Birchell-Sielaff fails to provide a specific comparison of the tasks that she did while Larsen was the manager and the tasks she did once Lehman took over. Accordingly, the court again cannot conclude that Birchell-Sielaff's job was "significantly diminished" rather than simply altered. Moreover, for the reasons discussed in regard to Jackson's retaliation claim, Birchell-Sielaff has not demonstrated that Lehman's failure to communicate with her and his elimination of management meetings exceeds inconvenience, and Birchell-Sielaff has not explained why attendance at the child support conference was vital to her job.

Furthermore, Birchell-Sielaff's claim that she was not appointed as the director of the child support division when the position was vacant is not severe enough to constitute an adverse employment action. There is an important difference between Birchell-Sielaff's daily duties as a supervisor and her occasional promotion to acting director. It stands to reason that the temporary acting director will be whomever Racine County feels is most qualified at the time of the vacancy. This might be Birchell-Sielaff, but it very well might not be. Thus, promotion was not an established

21

part of Birchell-Sielaff's position before her complaint was filed, and Birchell-Sielaff cannot lose what she did not have in the first place. Thus, absent a stated policy or recognized practice that Birchell-Sielaff was entitled to the temporary promotion, failure to appoint her as acting director cannot constitute an adverse employment action. More importantly, if Birchell-Sielaff would have been appointed as acting director, the promotion would have been temporary. Therefore, failure to promote Birchell-Sielaff is not the significant type of change that could be deemed an adverse employment action. Consequently, Racine County's motion for summary judgment as to Birchell-Sielaff's retaliation claim will be granted.

### 3. Schultz's Retaliation Claim

The parties dispute whether Racine County moved for summary judgment on Schultz's retaliation claim. In her response brief, Schultz states that Racine County "did not file a motion for summary judgment on Ms. Schultz [sic] claim other than to incorrectly state that she did not plead retaliation in her complaint." (Schultz Resp. Br. at 11.). Based on this position, Schultz did not address her retaliation claim in response to Racine County's motion.

Conversely, Racine County does not respond to Schultz's position in its reply brief. Instead, Racine County proceeds as if the clarity of its motion was not challenged and states that summary judgment as to Schultz's retaliation claim is required because the only opposition to the motion is based on citation to Schultz's complaint. (Racine County Reply at 39.).

Accordingly, the first issue that the court must resolve is whether Racine County's motion adequately apprises Schultz that summary judgment as to her retaliation claim has been sought. In the opinion of this court, it does. In its motion for summary judgment, Racine County states that it seeks summary judgment in its favor "with respect to *all claims* of the Plaintiffs, Brenda Jackson,

Sherri Lisiecki, Patricia Birchell-Sielaff *and the Estate of Linda R. Schultz*." (Racine County Mot. at 2.). Moreover, Schultz later states that Racine County does not discuss her retaliation claim *beyond* its argument that Schultz died before her deposition was taken or her affidavit could be sworn, leaving Schultz with only hearsay and testimony that is not based on personal knowledge. (Schultz Resp. Br. at 39, n. 2.). This argument in undisputedly applicable to Schultz's hostile work environment claim and her retaliation claim.

Thus, in opposition to Racine County's motion for summary judgment, Schultz was obligated to address Racine County's evidentiary challenge, at a minimum. In this regard, Schultz states only that she has already addressed Racine County's claim previously in her response. (Schultz Resp. Br. at 39, n. 2.). The court finds no such discussion. In regard to Racine County's evidentiary challenge to her hostile work environment claim, Schultz responds as follows:

> While Defendant [sic] has been left to rely almost entirely upon self-serving affidavits, the Estate is not forced into such a predicament. The Estate has witnesses who have first-hand knowledge of what was done by Larsen to Ms. Schultz. Both Russ Palermo, an employee under Ms. Schultz's supervision, and Ms. Sielaff, Ms. Schultz's immediate supervisor, witnessed Larsen's conduct and Ms. Schultz's responses first-hand. With this reliable and credible evidence, the Estate can meet its burden of proof.

(Schultz Resp. Br. at 20.). Schultz then goes on to cite the affidavit of Russ Palermo ("Palermo") and (via her proposed findings of fact) the affidavit of Birchell-Sielaff for the proposition that Larsen's conduct towards Schultz was improper. Schultz's argument and the affidavits are clearly limited to Schultz's hostile work environment claim and do not discuss retaliation. Thus, even if the court were to scour Schultz's pleadings based on the simple statement that Racine County's argument has "already addressed," a task that the court is not obligated to do, Schultz has failed to produce evidence sufficient to prevent summary judgment. In fact, as Racine County points out in its reply brief,

Federal Rule of Evidence 56(e) states that a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading." Rather, Schultz "by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Summary judgment in favor of Racine County is appropriate on this basis. Moreover, even if the court were to assume the truth of the allegations set forth in Schultz's complaint, Schultz cannot avoid the fact that her allegations are analogous to those of Birchell-Sielaff and Jackson. Thus, Schultz did not suffer an adverse employment action and summary judgment is appropriate on that basis as well.

For all of the reasons stated herein the court now enters the following order on the parties' cross-motions for summary judgment:

**IT IS THEREFORE ORDERED** that Racine County's motions for summary judgment as to Brenda Jackson, Sherri Lisiecki, The Estate of Linda R. Schultz, Patricia Birchell-Sielaff are **granted.**

**IT IS FURTHER ORDERED** that the plaintiffs' motions for partial summary judgment are **denied.**

**IT IS FURTHER ORDERED** that the Clerk shall enter judgment dismissing the plaintiffs' complaints and case numbers **02-C-936, 02-C-1262**, and **02-C-1263** with prejudice.

Dated at Milwaukee, Wisconsin this <u>19th</u> day of September, 2005.

s/AARON E. GOODSTEIN
United States Magistrate Judge
